## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Roxanne Woods,                                   :        Case No. 13CV2278

     Plaintiff,                               :

vs.                                              :

Commissioner of Social Security Administration,  :        **MEMORANDUM AND**
                                                          **ORDER**

     Defendant.                               :

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381, *et seq*. and 405(g).  Pending are briefs on the merits filed by both parties (Docket Nos. 16 & 17).  For the reasons set forth below, the Magistrate affirms the decision of the Commissioner.

### I.  PROCEDURAL BACKGROUND

On April 1, 2011, Plaintiff filed for SSI, alleging disability beginning May 1, 1994 (Docket No 12, p. 137 of 450).  Plaintiff's claim was denied on July 27, 2011, and upon reconsideration on December 14, 2011 (Docket No. 12, pp. 94; 102 of 450).  Plaintiff filed a written request for a hearing on January 18, 2012 (Docket No. 12, p. 109 of 450).  On July 9, 2012, Administrative Law Judge (ALJ) Eric Westley conducted a hearing at which Plaintiff, represented by counsel Heather Bancheck, and Vocational Expert (VE) Kathleen Reis, appeared and testified (Docket No. 12, p. 29 of 450).[1]  During the hearing, Plaintiff, through her counsel, amended her alleged

---

[1] The hearing transcript reflects that VE Reis attended by telephone (Docket No. 12, p. 31 of 450).

onset date from May 1, 1994 to February 2, 2011 (Docket No. 12, pp. 32-34 of 450).  The ALJ issued an unfavorable decision on July 24, 2012 (Docket No.12, p. 24 of 450).  The Appeals Council denied review of the ALJ's decision on August 21, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 5 of 450).

## II. FACTUAL BACKGROUND

A.    ADMINISTRATIVE HEARING

1.    PLAINTIFF'S TESTIMONY

Plaintiff testified that she is 54 years old and has three adult children.  Although she is still married, Plaintiff has lived separately from her husband for over 20 years (Docket No. 12, pp. 36-37 of 450).  She currently lives with a friend, but informed the ALJ that she did not know how long her current living arrangement would continue since she is unable to pay rent (Docket No. 12, p. 38 of 450).  Plaintiff indicated that she is unemployed and does not currently receive any other assistance or benefits (Docket No. 12, p. 38 of 450).  She recalled last working years ago assembling notebooks in a factory, but quit because she could not keep up with the work (Docket No. 12, p. 39 of 450).  Plaintiff testified that she does not have a driver's license and believed she last had one at age 21 (Docket No. 12, p. 39 of 450).  Plaintiff testified that she is a high school graduate and can read and write (Docket No. 12, p. 40 of 450).

When asked why she feels she cannot work, Plaintiff explained that she has a hard time getting along with people and hears voices which distract her (Docket No. 12, p. 40 of 450).  Plaintiff testified that her prescribed medications help to improve  her mental health; however,  she still hears voices, including on the bus while en route to the hearing (Docket No. 12, pp. 43-44 of 450).  With respect to her physical pain, Plaintiff noted that she experiences lower back pain stemming from an accident in 2004 (Docket No. 12, p. 42 of 450).  Plaintiff described feeling constant aching pain and remembered having been prescribed pain medication for her back but she could not recall the name of the medication (Docket No. 12, pp. 42-43 of 450).

2

During questioning by her attorney, Plaintiff explained how the voices she hears have caused her to act out in violence (Docket No. 12, pp. 44; 46 of 450).  Plaintiff first described an incident in which the voices told her to hit a sleeping friend, which she did, busting the friend's head open (Docket No. 12, pp. 44; 46 of 450).  On another occasion, Plaintiff indicated she had gotten in a fight with the same friend and stabbed him in the back, which resulted in her arrest and incarceration (Docket No. 12, p. 46 of 450).  Plaintiff recounted a final instance in which she beat up a woman  who had hired her to clean after the woman yelled at her (Docket No. 12, pp. 47; 52 of 450).  Plaintiff testified that at least some of these prior acts of violence had been the result of her drinking alcohol while on medications for her mental health, but that she had not consumed alcohol in over three years (Docket No. 12, p. 44 of 450).

Plaintiff described a typical day, noting that she brushes her teeth, bathes and gets dressed (Docket No. 12, pp. 44-45 of 450).  Plaintiff noted that she occasionally cleans the bathroom for her friend, sits on the porch, watches television, and shops at the grocery and corner stores (Docket No. 12, p. 44 of 450).  Plaintiff explained that she used to like attending church, but that it had gotten too crowded and she stopped going, opting instead to read her bible for approximately 30 minutes at a time (Docket No. 12, pp. 45-46 of 450).

After describing some recent health issues, Plaintiff indicated she feels depressed "maybe about a few times a week," which she indicated causes her to stay in her room (Docket No. 12, pp. 48-49 of 450).  Plaintiff testified that she sleeps a lot during the day and that her medication makes her drowsy (Docket No. 12, p. 49 of 450).  In response to questions about her physical tolerances, Plaintiff indicated she can stand approximately an hour before needing to rest, and is able to walk up to five city blocks or up to twenty minutes before needing to rest (Docket No. 12, pp. 49-50 of 450).  Plaintiff otherwise noted that her back sometimes aches when she sits (Docket No. 12, pp. 50-51 of 450).

## 2.    VE TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background before the hearing, the VE

described Plaintiff's past work of bindery worker, newspaper delivery person, and housekeeper as light duty and unskilled work (Docket No. 12, pp. 55-56; 58-59 of 450).  The VE testified that Plaintiff's prior work as a car washer is unskilled and medium work (Docket No. 12, p. 59 of 450).

ALJ Westley then posed his first hypothetical question:

[A]ssume the hypothetical individual can perform medium work, but: is limited to simple work related decisions; limited to frequent interaction with supervisors, coworkers and the public . . . limited to occasional changes in the workplace. Can the hypothetical individual perform any of the past relevant work that you described as it . . . was actually performed or generally performed in the national economy?

(Docket No. 12, p. 61 of 450).  Taking into account these limitations, the VE testified that such an individual would be able to perform the jobs of bindery worker, newspaper delivery, and housekeeping (Docket No. 12, pp. 61-62 of 450).  When asked if the hypothetical individual could perform any other work, the VE provided a list of jobs including cook helper, listed under DOT[2] 317.687-010, which is of medium exertion, unskilled and has a specific vocational preparation ("SVP")[3] level of 2  (Docket No. 12, p. 62 of 450).  In the nation, the VE indicated that there are at least 250,000 of these jobs and at least 8,000 in the State of Ohio (Docket No. 12, p. 62 of 450).  The next position the VE offered was that of kitchen helper, listed under DOT 318.687-010, a medium, unskilled position with a SVP of 2, in which there are at least 180,000 such jobs in the nation and at least 7,000 the State of Ohio (Docket No. 12, p. 62 of 450).  The final position the VE gave was that of industrial cleaner, listed under DOT 381.687-018, a medium, unskilled position with a SVP of 2, in which there are at least one-million such jobs in the nation and 30,000 in Ohio (Docket No. 12, p. 62 of 450).

ALJ Westley then posed his second hypothetical asked:

---

[2] Dictionary of Occupational Titles ("DOT")

[3] SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

4

> I want you to assume everything in hypothetical one and then add . . . limited to occasional interactions with supervisors, coworkers and the public.  Can the hypothetical individual perform any of the past jobs that you described?

(Docket No. 12, p. 62 of 450).  With those limitations, the VE ruled out the work of car washer and factory work, but noted that newspaper delivery and house cleaner would remain (Docket No. 12, p. 62 of 450).  When asked about other work this hypothetical individual might be capable of performing, the VE offered the position of order picker, a fact checking job,  listed under DOT 922.687-058, a medium, unskilled position with a SVP of 2, in which there are at least 120,000 jobs in the nation, and 8,000 in the State of Ohio (Docket No. 12, p. 63 of 450).

For his third hypothetical, ALJ Westley asked:

> I want you to assume the same as hypo two but the individual is limited to simple one to four step tasks.  Can that individual perform any of the past jobs you described?

(Docket No. 12, p. 63 of 450).  The VE noted that such limitations would preclude the hypothetical individual from performing any of the prior jobs described (Docket No. 12, p. 63 of 450).  The VE also testified that there would be no other jobs that the hypothetical individual could perform in the national economy (Docket No. 12, p. 63 of 450).

During cross-examination, Plaintiff's counsel asked the VE to refer back to the ALJ's question in hypothetical two and consider additional limitations prohibiting fast paced work or production quotas, and a need for the hypothetical individual to be located near a restroom to account for the need for more frequent restroom breaks, whether such an individual would be capable of performing any of the past work (Docket No. 12, pp. 64-65 of 450).  The VE answered that the hypothetical individual would be unable to perform the factory work, newspaper delivery, housekeeper, and car washer work given the availability of restrooms and production requirements (Docket No. 12, pp. 65-66 of 450).  The VE was unable to provide any DOT position which would account for the restroom limitations and also satisfy the limiting criteria of the hypothetical (Docket No. 12, p. 67 of 450).

5

**B.**     **MEDICAL RECORDS**

**1.**     **INPATIENT HOSPITALIZATION RECORDS**

On January 27, 2004, Plaintiff visited the Emergency Department at the University Hospitals of Cleveland complaining of feeling extremely anxious, with anxiety and depression, with questionable suicidal ideation.  She reported getting into a lot of fights and recently having been incarcerated for hitting someone with a hammer. Plaintiff tested positive for cocaine metabolites and was diagnosed with substance-induced mood disorder (Docket No. 12, pp. 233-239 of 450).

**2.**     **TREATMENT RECORDS - OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS**

The record in this case also includes a number of mental health treatment records for the care Plaintiff received while she was incarcerated.

- On May 4, 2009, Plaintiff underwent a mental health evaluation by Dr. Steven M. Gemma, M.D. Her medications were listed as Abilify,[4] Zoloft,[5] and Trazodone.[6]  The results of her mental status examination reflect Plaintiff was mildly depressed and constricted, but had adequate judgment. Plaintiff's diagnosis was noted as Schizoaffective Disorder,[7] Unipolar, a history of alcohol and crack dependence, Antisocial Personality Disorder, Anemia, and she was assessed a global

---

[4] Abilify is used to treat certain mental and mood disorders, including bipolar disorder, schizophrenia and may be used in combination with other medications to treat depression. *Abilify oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 7, 2014, 8:53 AM), http://www.webmd.com/drugs/drug-64439-Abilify+Oral.aspx?drugid=64439.

[5] Zoloft is often prescribed to treat depression, panic attacks, obsessive compulsive disorder, post-traumatic stress disorder, and social anxiety disorder. *Zoloft oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 7, 2014, 8:56 AM), http://www.webmd.com/drugs/mono-8095-SERTRALINE+-+ORAL.aspx?drugid=35&drugname=zoloft+oral.

[6] Trazodone is used to treat depression and insomnia related to depression.  *Trazodone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 7, 2014, 9:01 AM), http://www.webmd.com/drugs/mono-89-TRAZODONE+-+ORAL.aspx?drugid=11188&drugname=Trazodone+Oral&source=0.

[7] Schizoaffective disorder has features of two different conditions, schizophrenia, and an affective disorder which may be diagnosed as either major depression or bipolar disorder. *Understanding Schizophrenia and Schizoaffective Disorder*, WEBMD, (July 7, 2014, 9:07 AM), http://www.webmd.com/schizophrenia/guide/mental-health-schizoaffective-disorder.

assessment of functioning ("GAF")[8] score of 60 (Docket No. 12, pp. 273-275 of 450)

- On July 30, 2009, Plaintiff underwent a transfer evaluation by Dr. R. Schlachet, D.O., and presented no complaints, and had been taking her medications daily. Plaintiff was assessed a general ability measure for adults ("GAMA")[9] score of 95 and a GAF of 65. The diagnostic impression indicates Plaintiff was stable on her current medications (Docket No. 12, pp. 270-272 of 450).

- On July 8, 2010, Plaintiff was examined by Dr. Schlachet for an annual evaluation. The treatment notes reflect that Plaintiff had no complaints, her medications were effective and noted her GAMA score at 95. Notes in the margins reflect Plaintiff was eating well, sleeps okay at night, but was unable to recall the last two presidents during cognitive testing. Plaintiff diagnosis remained unchanged and she was assessed a GAF score of 65 (Docket No. 12, pp. 265-267 of 450).

- A Mental Discharge/Transfer/Treatment Summary dated November 18, 2010, notes Plaintiff's primary diagnosis as Schizoaffective Disorder depressive type. Plaintiff denied suicidal or homicidal ideations and it was recommended Plaintiff follow-up with mental health services and be given a supply of medications upon her release from prison (Docket No. 12, p. 263 of 450).

- A Mental Health Discharge Summary signed by Dr. Schlachet and dated January 26, 2011, reflects that Plaintiff began treatment for her Schizoaffective Disorder type on July 30, 2009. At the time of discharge, Plaintiff was described as stable and not demonstrating any severe mental health symptoms. It was noted that Plaintiff functioned with the general population adequately during her incarceration (Docket No. 12, p. 262 of 450).

3.    OFFICE TREATMENT RECORDS - METROHEALTH SYSTEM

- On February 7, 2011, Plaintiff visited Dr. Michele M. Geraci-Rambasek, M.D., for medication refills. It was recommended Plaintiff follow up in behavior health for medication management and obtain a new primary care physician (Docket No. 12, pp. 293-294 of 450).

- On April 18, 2011, Plaintiff visited Dr. Jose Mendez, M.D. for her Psychosis. The treatment notes reflect Plaintiff's diagnosis as Schizoactive Disorder of an unspecified condition (Docket No. 12, pp. 285-286). The results of Plaintiff's examination note Plaintiff experienced auditory hallucinations, poor memory, and depressed mood. Plaintiff's diagnosis included Schizoaffective

---

[8]  The Global Assessment of Functioning is "a 100-point tool rating overall psychological, social and occupational functioning of people over 19 years of age and older." *GAF Index*, UNIV. OF WASH., (July 9, 2014, 8:52 AM), https://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm.

[9]  "The General Ability Measure for Adults (GAMA) test is a brief, self-administered, nonverbal measure of intelligence that was normed on a census-based sample of 2,360 adults. The GAMA IQ score provides an estimate of an individual's general intellectual ability, can be administered in a variety of settings and may be especially useful in situations that requires an assessment of general ability using nonverbal means." *GAMA™ (General Ability Measure for Adults)*, UNIV. OF N. COLO., (July 9, 2014, 8:50 AM), http://www.unco.edu/cebs/schoolpsych/faculty/bardos/gama.html.

Disorder, back pain, and an assessed GAF score of 51-60 for moderate symptoms (Docket No. 12, pp. 290-292 of 450).

- On May 18, 2011, Plaintiff had a complete examination with Dr. Kenneth B. Frisof, M.D.  The treatment notes reflect that Plaintiff suffers from Depression and Schizoaffective Schizophrenia. Plaintiff's treatment plan included refills for her psychoactive medications and a follow up behavioral health appointment (Docket No. 12, p. 282-284 of 450).

**4.  REBECCA R. SNIDER-FULLER, PRACTICING CLINICAL NURSE SPECIALIST (PCNS)**

- On August 30, 2011, Plaintiff complained of hearing voices and back pain.  Plaintiff's diagnosis included Schizoaffective Disorder and back pain.  Plaintiff's GAF score was documented as 55-60 for moderate symptoms (Docket No. 12, pp. 325-329 of 450).

- On October 5, 2011, Plaintiff had a follow up for medication management.  The results of Plaintiff's physical examination noted Plaintiff still hears negative voices, has low energy and motivation, poor concentration, irritability, and isolates herself.  Plaintiff's treatment notes do not reflect any change in her diagnosis, GAF score or change in her treatment plan (Docket No. 12, pp. 347-348 of 450).

- On December 15, 2011, Plaintiff was seen for medication management.  Plaintiff reported feeling depressed.  The results of Plaintiff's physical examination indicate Plaintiff reported fewer auditory hallucinations with her medications.  Plaintiff's medications were maintained and her diagnosis and GAF score remained unchanged (Docket No. 12, pp. 374-377 of 450).

- On January 6, 2012, Plaintiff complained she was agitated and did not want to hurt anyone, that the voices she hears were bothering her.  Plaintiff's physical examination reveals she was experiencing paranoid thoughts, hearing voices, feeling irritable, guilty, and isolating herself. Plaintiff's energy, motivation, and concentration were described as "not good."  Ms Snider-Fuller opined that increases in Plaintiff's stress level seem to exacerbate her hallucinations.  Plaintiff's diagnosis remain unchanged, however her GAF score was documented as 50 and her medications were maintained at their same levels (Docket No. 12, pp. 385-388 of 450).

- On February 8, 2012, Plaintiff reported doing better, that she still hears voices, but they were settling down.  Plaintiff's mental status examination noted paranoid thoughts, auditory hallucinations, but improved mood, energy, and motivation. Plaintiff indicated feeling guilty, less irritable, and that her concentration was not too good.  Plaintiff's medications were maintained. Plaintiff's GAF score was noted as 55 (Docket No. 12, pp. 395-397 of 450).

**C.  ASSESSMENTS**

**1.  ADULT DIAGNOSTIC ASSESSMENT - BEHAVIORAL - SHARISSE EDWARDS, PROFESSIONAL CLINICAL COUNSELOR/LICENSED CHEMICAL DEPENDENCY COUNSELOR III (PCC/LCDC III)**

On August 31, 2011, Plaintiff underwent an Adult Diagnostic Assessment with Ms. Edwards at the request

8

of MetroHealth and ARCA House (Docket No. 12, p. 301 of 450).  Plaintiff claimed in her interview with Ms. Edwards that she communicates with her mother and siblings, is good at cleaning houses and with people, enjoys playing cards, attending church every Sunday and Alcoholics Anonymous meetings three times a week (Docket No. 12, 301 of 450).  Ms. Edwards' observed that Plaintiff presented herself in a depressed mood, suffered from blocked thought process, was cooperative, but agitated by certain questions (Docket No. 12, p. 307 of 450). Plaintiff was described as appearing to be stimulated by internal stimuli but did not report auditory hallucinations during the assessment (Docket No. 12, pp. 307-308; 312-313 of 450).   The diagnosis section of the assessment reflects a primary diagnosis of Psychosis not otherwise specified with a notation to rule out Schizoaffective Disorder (Docket No. 12, p. 309 of 450).  Plaintiff's treatment plan included referrals for psychiatric services, medication monitoring, and services to assist with filling out entitlement benefits (Docket No. 12, p. 309 of 450).

## 2.  DR. JYOTE ANEJA, M.D. - MEDICAL SOURCE STATEMENT - MENTAL RESIDUAL FUNCTIONAL CAPACITY ("RFC")

A Medical Source Statement for Plaintiff's mental capacity dated January 13, 2012, contains the signatures of Rebecca Snider Fuller, Advanced Practice Registered Nurse Board Certified (APRN)(BC), and Dr. Aneja (Docket No. 12, p. 324 of 450).  The assessment ranks Plaintiff poorly in nine of twelve mental activities listed under the category of making occupational adjustments (Docket No. 12, pp. 323-324 of 450).  For the category concerning intellectual functioning, Plaintiff was assessed as 'good' at understanding, remembering and carrying out simple job instructions, but graded as 'poor' and 'fair' in comprehending and executing more complex instructions (Docket No. 12, p. 324 of 450).  In the final category of making personal and social adjustments, Plaintiff was assessed as 'fair' in maintaining appearance, managing funds and schedules, and in her ability to leave home on her own.  Plaintiff was graded as 'poor' with respect to her abilities to socialize, behave in an emotionally stable manner, and relate predictably in social situations (Docket No. 12, p. 324 of 450). In support of the assessment, the evaluators' comments indicate that Plaintiff has active auditory hallucinations, is easily

agitated, paranoid, and of a depressed mood (Docket No. 12, p. 324 of 450).

A second undated Medical Source Statement for Plaintiff is included in the record and is also signed by Ms. Snider-Fuller and Dr. Aneja (Docket No. 12, pp. 449-450 of 450).  Plaintiff's second assessment closely mirrors her first assessment.  Under the category of making occupational adjustments, Plaintiff received 'poor' marks in eleven of twelve mental activities of work (Docket No. 12, pp. 449-450 of 450).  In intellectual functioning, Plaintiff was graded as 'poor' for the mental activities of understanding, remembering and carrying out both complex and non-complex job instructions, and 'fair' in understanding and carrying out simple job instructions (Docket No. 12, p. 450 of 450).  In the final category of making personal and social adjustments, Plaintiff received 'poor' marks in the mental activities of maintaining appearance, socializing, behaving in an emotionally stable manner, relating predictably in social situations, and managing of funds and schedules. Plaintiff received a grade of 'fair' in her ability to leave home on her own (Docket No. 12, p. 450 of 450).  The evaluators' comments provided in support of the assessment reflect that Plaintiff has a history of auditory hallucinations, paranoia, depressed mood, poor concentration and sleep, irritability, anger issues, and has been sober for more than three years (Docket No. 12, p. 450 of 450).

### 3.    AGENCY'S MENTAL RFC FINDINGS

For Plaintiff's initial disability determination, her Psychiatric Review Technique (PRT) and Mental RFC assessment were completed by Dr. David Demuth, M.D.  The report reflects that Plaintiff's Psychotic disorders were a medically determinable impairment, but failed to satisfy any of the listing criteria under the 12.03 listing (Docket No. 12, p. 72 of 450).  Dr. Demuth's mental RFC of Plaintiff assessed moderate limitations for activities under the categories of understanding and memory, social interactions, concentration, persistence and pace, and in her ability to adapt (Docket No. 12, p. 73-75 of 450). Despite Plaintiff's limitations, Dr. Demuth's explanation indicates that Plaintiff is capable of completing tasks requiring between one and four steps, static in nature, and that any changes be explained (Docket No. 12, p. 75 of 450).  It was otherwise noted that Plaintiff should be

10

limited from the public and does best working alone or in small groups (Docket No. 12, p. 75 of 450).

Upon reconsideration, Plaintiff's PRT and mental RFC assessments were completed by Caroline Lewin, Ph.D. (Docket No. 12, pp. 87; 90 of 450). Dr. Lewin determined that Plaintiff's Psychotic Disorders were also medically determinable impairments, but that they failed to satisfy any of the criteria under listing 12.03 (Docket No. 12, p. 87 of 450). In her mental RFC assessment, Dr. Lewin also determined Plaintiff has moderate limitations in understanding and memory, social interactions, concentration, persistence and pace, and in her ability to adapt. Dr. Lewin opined that despite Plaintiff's Schizoaffective Disorder, she could complete tasks requiring between one and four steps, which are relatively static and do not require independent prioritization (Docket No. 12, p. 90 of 450). Dr. Lewin noted Plaintiff's interaction with the public should be limited and that Plaintiff works best alone or in small groups (Docket No. 12, p. 90 of 450).

### III. STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014). At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923). At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014). If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's]

11

limitations." 20 C.F.R. § 416.945(a) (West 2014). In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014). At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014). If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014). While the claimant has the burden of proof in steps one through four. The Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted). If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014). If an adjustment cannot be made then the claimant is disabled. *Id.*

## IV. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Westley made the following findings:

12

1.   Plaintiff has not engaged in substantial gainful activity since March 18, 2011, the application date.

2.   Plaintiff has the following severe impairments: schizoaffective disorder, depression, osteopenia, and mild degenerative joint disease of the facet joints.

3.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.   After careful consideration of the entire record, the undersigned finds that Plaintiff has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c) except that Plaintiff can make only simple work-related decisions, have only occasional changes in the workplace, and have only occasional interaction with supervisors, coworkers, and the public.

5.   Plaintiff has no past relevant work.

6.   Plaintiff was born on April 19, 1958 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.

7.   Plaintiff has at least a high school education and is able to communicate in English.

8.   Transferability of job skills is not an issue because Plaintiff does not have past relevant work.

9.   Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.  Plaintiff has not been under a disability, as defined in the Social Security Act, since March 18, 2011, the date the application was filed.

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that ALJ Westley's determination that she is not disabled is not supported by substantial evidence (Docket No. 16). Plaintiff first assertion is that ALJ Westley erred by failing to properly weigh the opinion evidence of Dr. Jyoti Aneja, whom Plaintiff contends is a treating physician (Docket No. 16, p. 9-13 of 19). Plaintiff's second assertion is that ALJ Westley erred in finding Plaintiff did not meet or equal the listing criteria under 12.03 and 12.04 (Docket No. 16, pp. 13-17 of 19). Plaintiff argues that these errors require remand of this case so that the ALJ may properly evaluate the opinions of her treating physician and the severity of her impairments (Docket No. 16, p. 18 of 19).

### B. DEFENDANT'S RESPONSE

Defendant disagrees with Plaintiff's assignments of error and argues that ALJ Westley's findings are supported by substantial evidence (Docket No. 17). Defendant first disputes Plaintiff's contention that Dr. Aneja is a treating physician, citing the lack of evidence of a treating relationship between Dr. Aneja and Plaintiff (Docket No. 17, p. 8 of 17). Defendant asserts that ALJ Westley's decision to discount the weight of Dr. Aneja's

opinion is supported by substantial evidence (Docket No. 17, p. 8-11 of 17). In response to Plaintiff's second assignment of error, Defendant argues that ALJ Westley's determination that Plaintiff does not meet or equal the requirements under listings 12.03 and 12.04, is supported by substantial evidence (Docket No. 17, pp. 11-15 of 17). Defendant maintains that ALJ Westley reasonably relied on Dr. Lewin's criteria 'B' findings, which Defendant argues are supported by substantial evidence (Docket No. 17, pp. 11-15 of 17).

**C.    ANALYSIS**

**1.    THE TREATING PHYSICIAN RULE**

Federal regulations prescribe certain standards an ALJ must comply with in assessing the medical evidence contained in the record. The treating physician rule is one such standard and requires that a treating physician's assessment be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996)("Controlling weight may not be given to a treating source's opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). This rule stems from the belief that a claimant's treating physicians are best positioned, as medical professionals, to provide a detailed picture of the claimant's impairment and can provide unique perspective that might not otherwise be obtained from the objective evidence or other reports of examinations. *See* 20 C.F.R. § 404.1527(c)(2) (West 2014).

A "treating source" is defined as the claimant's "physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.902 (West 2014). An "acceptable medical source" includes licensed physicians, licensed or certified psychologist, licensed optometrists, podiatrists and qualified speech-language pathologists. 20 C.F.R. §§ 416.902, 416.913(a) (West 2014). Only

evidence from "acceptable medical sources" may be used to establish the existence of a medically determinable impairment or render a medical opinion. 20 C.F.R. §§ 416.913(a), 416.927(a)(2) (West 2014).  A "nonexamining source" includes a "physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902 (West 2014).

Evidence from those who are not "acceptable medical sources" are classified as "other opinion evidence" and may be used to show the severity of the claimant's impairments and its impact on the claimant's functioning. SSR 06-03, 2006 WL 2329939 *3 (Aug. 9, 2006) (West 2014).  If the medical opinion from a "treating source" is not given controlling weight, the opinion must be evaluated to determine the weight, if any, to give the medical opinion. 20 C.F.R. § 416.927(c) (West 2014).  The regulations set forth the factors the adjudicator must consider in making such a determination, including the length, frequency, nature and extent of the examining and treating relationship, the supportability of the opinion with medical and laboratory findings, the consistency of the opinion with the record as a whole, the specialization of the source of the opinion, and any other factors which tend to support or contradict the opinion. *Id.*

Defendant's contention that Dr. Aneja is not a treating physician is well taken.  The medical record lacks any details of a treating relationship between Plaintiff and Dr. Aneja.  Other than the medical source statements, Dr. Aneja's name only appears on two additional records, one record contains Dr. Aneja's electronic signature in reference to medication refills and another record notes that Plaintiff's previous visit with MetroHealth System was with Dr. Aneja on April 28, 2011 (Docket No. 12, pp. 382-384; 405 of 450).  Neither record contains any detail about Dr. Aneja's treatment or history of care as it pertains to Plaintiff.  Given the lack or corroborating evidence of a treating relationship, Dr. Aneja cannot be classified as a treating source;  therefore, Dr. Aneja's opinion is not entitled to controlling weight.  Instead, Dr. Aneja's opinion must be assessed as any other medical opinion in consideration of the factors set forth in 20 C.F.R. § 416.927(c). *Id.*

In his decision, ALJ Westley reports giving Dr. Aneja's opinion little weight on the basis that the opinions

16

were "drastically inconsistent" and unsupported by the objective evidence of the record (Docket No. 12, p. 21 of 450). The objective evidence, ALJ Westley reasoned, supports no more than moderate symptoms, however; Dr. Aneja's findings assess greater limitations without having provided any supporting details (Docket No. 12, p. 21 of 450). Consistency and supportability of a medical opinion are among the § 416.927(c) factors ALJ Westley was required to consider in evaluating Dr. Aneja's opinion. By addressing those factors, ALJ Westley has complied with the requirements of the rule since there is no requirement that the ALJ expressly address each of the § 416.927(c) factors. 20 C.F.R. § 416.927(c) (West 2014).

Among the opinions ALJ Westley determined most credible in his analysis was that of Dr. Lewin, which he afforded significant weight in his analysis based on the consistency of her opinion with the evidence of the record (Docket No. 12, p. 17 of 450). Despite some moderate functional limitations, Dr. Lewin opined that Plaintiff is capable of conducting tasks comprised of between one and four steps where the job is relatively static, changes can be explained, there is limited prioritization, and limited public interactions, nothing that Plaintiff does best in small groups or working alone (Docket No. 12, pp. 21-22 of 450). The evidence supports Dr. Lewin's findings.

While in prison, Plaintiff's mental health treatment records reflect that she responded well to her medications, but documented difficulties with concentration, depression, judgment, and mood. Despite such issues, Plaintiff was consistently assessed GAF scores between 61-70, which is consistent with mild symptoms (Docket No. 12, pp. 265-267; 270-272 of 450); *Global Assessment of Functioning (GAF) Scale*, WASH. UNIV., (June 30, 2014, 8:36 AM), https://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm (Scores ranging between 61-70, are associated with "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships"). Plaintiff's treatment records following her release from prison in February 2011, are fairly consistent, describing her as stable,

17

documenting ongoing issues with memory, mood, concentration, judgment, and assessing GAF scores within the 50-70 range, consistent with mild-to-moderate symptoms (Docket No. 12, pp. 290-292; 309; 325-329; 347-348; 374-377 of 450). While GAF scores are not dispositive of any issue in social security disability cases, the Sixth Circuit has observed that such scores may be helpful to ALJs. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)(observing that while not essential, "a GAF score may be of considerable help to the ALJ in formulating the Plaintiff's RFC").

For these reasons, the undersigned Magistrate finds ALJ Westley's determination to afford greater weight to Dr. Lewin over Dr. Aneja is supported by substantial evidence.

### 2. THE ALJ'S MEET OR EQUALS ANALYSIS

In Plaintiff's second assignment of error, she alleges that the ALJ erred in failing to find that Plaintiff does not meet or equal the requirements of the listings in 12.03 and 12.04 (Docket No. 16, p. 13 of 19). Plaintiff contends that there is substantial evidence that Plaintiff meets or equals the requirements of either one or both of the listings under 12.03 and 12.04 (Docket No. 16, pp. 13-17 of 19). Defendant disagrees and contends that the ALJ Westley reasonably relied on Dr. Lewin's opinion, in part, because Dr. Lewin was one of only two doctors, both on behalf of the State agency, that reviewed Plaintiff's case using the 'B' criteria (Docket No. 17, p. 13 of 17). Defendant maintains that ALJ Westley's findings that Plaintiff does not meet or equal the criteria of listings 12.03 and 12.04 is supported by substantial evidence (Docket No. 17, pp. 13-15 of 17).

At step-three of the five step process for evaluation of a disability, the ALJ had to consider the medical severity of Plaintiff's impairments. 20 C.F.R. § 416.920(d) (West 2014). In order to find the Plaintiff disabled at step-three, the ALJ had to determine whether the Plaintiff's impairment(s) meets or equals one of the listings in Appendix 1 to subpart P of part 404, and meets the duration requirement. *Id.* An impairment is medically equivalent to a listed impairment in Appendix 1 of Subpart P of part 404, "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926 (West 2014). The listing of impairments

18

contained in Appendix 1, "describes for each of the major body systems impairments that [the Commissioner] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a) (West 2014).

Plaintiff's allegations concern listings 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders, and 12.04 Affective Disorders (Docket No. 16, p. 13 of 19); 20 C.F.R. Pt 404, Subpt. P, App. 1 §§ 12.03, 12.04 (West 2014).  To satisfy either listing, a claimant must satisfy both the 'A' and 'B' criteria or alternatively, the 'C' criteria of the listing. *Id.*   In this case, ALJ Westley's decision indicates that Plaintiff failed to satisfy any of the criteria for listings 12.03 and 12.04 (Docket No. 12, p. 16-17; 18 of 450).  To satisfy the 'B' criteria under either listing 12.03 of 12.04, a Plaintiff must meet the  'A' criteria of the listing and result in at least two of the following: 1) marked restriction of activities of daily living; or 2) marked difficulties in maintaining social functioning; or 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt 404, Subpt. P, App. 1 §§ 12.03, 12.04 (West 2014).

The term "marked" as it is used under the criteria is not defined by specific quantitative threshold, but is instead evaluated "by the nature and overall degree of interference with function." *Id.* at § 12.00(C) (West 2014).  For activities of daily living, the regulations suggest that a claimant demonstrating serious difficulties in performing activities of daily  "without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions," might result in a finding that such a claimant has "marked" restrictions in that category of functioning. *Id.*  With respect to social functioning, the regulations provide that a claimant who is "highly antagonistic, uncooperative or hostile, but [is] tolerated by local storekeepers," may nevertheless be found to have a "marked limitation because such behavior is not acceptable in other social contexts." *Id.*   Under an analysis of concentration, persistence and pace, a "marked" restriction or limitation might be appropriate, according to the regulations, if a claimant demonstrates an inability to complete

19

simple tasks, "without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions." *Id.*

Plaintiff argues that there is substantial evidence in the record that she has "marked" restrictions or limitations in activities of daily living, social functioning, and concentration, persistence and pace (Docket No. 16, pp. 13-17 of 19). Plaintiff mistakes the standard of review applied to this Court's review of the Commissioner's findings. ALJ Westley's findings are "not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted). Instead, the undersigned Magistrate must affirm the ALJ's findings unless he failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *See McClanahan*, 474 F.3d at 832-33 (citing *Branham*, 383 F.2d 614 at 626-27).

ALJ Westley determined that Plaintiff did not satisfy the criteria for listings 12.03 and 12.04 (Docket No. 12, p. 16 of 450). In his analysis of the 'B' criteria, ALJ Westley determined, relying in large part on Dr. Lewin's findings, that Plaintiff has no restriction in activities of daily living, moderate difficulties in both social functioning and concentration, persistence or pace, and no episodes of decompensation of an extended duration (Docket No. 12, pp. 16-18 of 450). Dr. Lewin was one of only two sources, both on behalf of the State agency, that considered Plaintiff's disability under the criteria. Neither of those doctors found that Plaintiff had more than moderate limitations under any of the criteria 'B' factors (Docket No. 12, pp. 72; 87 of 450). "State agency medical and psychological consultants . . . are highly qualified . . . [and] are experts in Social Security disability evaluation." *See* 20 C.F.R. § 416.927(e)(2)(i) (West 2014).

To support his determination that Plaintiff has no restriction in activities of daily living, ALJ Westley cites Plaintiff's own statements, including her Function Statement from July 2011, in which she noted no difficulties with activities of daily living, and indicated that she is able to clean, do laundry, and prepare only simple meals

because she is lazy (Docket No. 12, p. 17 of 450).  ALJ Westley's findings are consistent and supported by the record.  In addition to Function Statement from July 2011, Plaintiff completed another Function Statement in November 2011, in which she listed her daily activities as "getup, shower, dress, watch TV, eat, read, nap, nap some more, go to appointments if I have them" (Docket No. 12, p. 191 of 450).   Plaintiff noted no longer preparing meals because she lived in a halfway house, but indicated she performed daily housework, with encouragement, including mopping the floor (Docket No. 12, p. 192 of 450).   Plaintiff's Function Report also reflects that she shops for food three times a week and attends church on Sundays (Docket No. 12, p. 193 of 450).  While Plaintiff cites her hearing testimony, in which she testified that she sometimes stays in her room and refrains from bathing a few days a week, in order to argue that she has marked restrictions in activities of daily living, she also testified that her typical day includes brushing her teeth, washing up, getting dressed, occasional cleaning, sitting on the porch, watching television and going to the store (Docket No. 16, p. 15 of 19; Docket No. 12, pp. 44-45 of 450).  Therefore, the undersigned Magistrate finds ALJ Westley's determination that Plaintiff has no restrictions in activities of daily living is supported by substantial evidence.

ALJ Westley's rationale supporting his determination that Plaintiff has moderate difficulties in social functioning includes Dr. Lewin's mental RFC findings (Docket No. 12, p. 17; 90 of 450).  Dr. Lewin opined that Plaintiff has a moderately reduced ability to maintain public interaction, works best in small groups or alone, and is capable of sustaining tasks that involve occasional and superficial interaction with others and do not otherwise require conflict resolution (Docket No. 12, p. 17; 90 of 450).  In response, Plaintiff cites her hearing testimony describing her difficulties getting along with others, history of violence, paranoia, and tendency to isolate, to argue that she has a marked limitation in social functioning (Docket No. 16, p. 15 of 19).  The record supports Dr. Lewin's findings.

Plaintiff testified that she rides the bus and shops at the grocery store (Docket No. 12, pp. 44-45 of 450).  Plaintiff's Function Reports notes that she attends "groups" on Tuesdays, goes to meetings, watches television,

21

shops, attends church and medical appointments (Docket No. 12, pp. 44-45; 173; 191; 193 of 450). While Plaintiff references prior acts of violence in support of her contention that she has marked limitations in social interaction, Plaintiff testified that her prior acts of violence stemmed from drinking alcohol while medicated (Docket No. 12, p. 44 of 50). The record contains several notations that Plaintiff has not consumed alcohol in three years and has expressed her desire to remain sober (Docket No. 12, p. 44; 304 of 450). Plaintiff's mental health treatment records are absent evidence of any recent acts of violence or public safety concerns (Docket No. 12, p. 262; 285-286; 290-292 of 450). Therefore, the undersigned Magistrate finds the ALJ's determination that Plaintiff has moderate difficulties in social functioning is supported by substantial evidence.

As for his findings that Plaintiff has moderate difficulties in maintaining concentration, persistence or pace, ALJ Westley again relied upon Dr. Lewin's findings that Plaintiff has reduced concentration and stress, but remains capable of performing tasks comprised of between one and four steps, in a relatively static environment, where changes can be explained, and required limited planning (Docket No. 12, p. 17 of 450). Plaintiff disagrees with ALJ Westley's findings and cites her hearing testimony describing her difficulties concentrating due to the voices she sometimes hears (Docket No. 16, pp. 16-17 of 19). The record includes evidence that Plaintiff reads the Bible for thirty minutes at a time, attends meetings, watches television, prepares basic meals, performs household chores, handles money and shops (Docket No. 12, pp. 44-46; 173-174; 176; 191-193). While Plaintiff's treatment records note her difficulties with concentration, mood, depression, energy, and auditory hallucinations, she was consistently assessed GAF scores within the range of mild-to-moderate symptoms (Docket No. 12, pp. 290-292; 325-329; 347-348; 374-377; 395-397; 395-397; 273-275; 270-272; 265-267). Accordingly, the undersigned Magistrate finds that ALJ Westley's determination concerning Plaintiff's concentration, persistence and pace are supported by substantial evidence.

Given that ALJ Westley's determined that Plaintiff failed to meet the 'B' criteria, an analysis under the 'A' criteria is unnecessary since the listings require the claimant to satisfy both the 'A' and 'B' criteria or in the

alternative, just the 'C' criteria. *See* 20 C.F.R. Pt 404, Subpt. P, App. 1 §§ 12.03, 12.04 (West 2014). During his analysis, ALJ Westley determined that the evidence failed to establish the presence of 'C' criteria (Docket No. 12, p. 18 of 450). The 'C' criteria for listing 12.03 and 12.04, is the same and requires the claimant to establish a medically documented history of chronic affective disorder meeting the duration requirement and one of the following: 1) repeated episodes of decompensation, each of extended duration; or 2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompsensate; or 3) current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of a continued need for such an arrangement. 20 C.F.R. Pt 404, Subpt. P, App. 1 §§ 12.03, 12.04 (West 2014). Plaintiff does not specifically allege any error concerning ALJ Westley's criteria 'C' findings. After reviewing the evidence, the undersigned Magistrate finds that the ALJ's determination concerning criteria 'C' is supported by substantial evidence.

For the foregoing reasons, the undersigned Magistrate finds ALJ Westley's Step-three finding is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: July 31, 2014